UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
New York Bay Capital, LLC,

                            Plaintiff,

                                                        Case No. 19-CV-_____  (      )

                 -vs-

Cobalt Holdings, Inc.,                                   **COMPLAINT**

                            Defendant.
----------------------------------------------------------x


        The plaintiff, New York Bay Capital, LLC ("<u>NYBAY</u>") by and through counsel of record

for their Complaint against the above-named defendant, Cobalt Holdings, Inc. ("<u>Cobalt</u>"), states:


                            **I. NATURE OF THE ACTION**

        1.  This action arises out of a binding contract under which NYBAY agreed to render

financial advisory and other services to defendant for the development of an $82.5 million

telecommunications project, one of the largest in Mexico, including a build-out stretching 180

kilometers between Tulum and Cancun, known as the Riviera Maya. By this complaint, NYBAY

seeks a money judgment against the above-named defendant for breaches and anticipatory

repudiation of the contract for transaction-based compensation or success fees earned, including

breaches of the non-circumvention provision of the contract to avoid paying any fees to NYBAY

Capital for services rendered over nearly a year's time.

        2.   Defendant has defaulted in paying NYBAY's fees for the successful closing of the

first round of financing realized for the project on May 31, 2018 in the form of a substantial

credit facility in the total sum of $32.5 million. NYBAY was instrumental in collaborating with

Cobalt, at the request of Cobalt, in helping to identify, introduce and actively facilitate the procurement of one of the leading multinational financial services company, Credit Suisse Group AG ("Credit Suisse AG") for the closing.

3.   The arm of Credit Suisse AG that closed on the $32.5 million credit facility in Mexico for the initial round of project financing for the closing was Credit Suisse Asset Management. This is a business within Credit Suisse AG's International Wealth Management division. In Mexico, the group manages several country-dedicated funds that incorporate debt strategies with private companies, such as the first round of project finance, credit facility of $32.5 million that successfully closed with Cobalt.

4.   Defendant has also anticipatorily repudiated its duties and obligations to pay NYBAY the balance of the fees that would otherwise be due and payable to NYBAY for the second round of financing or investment in the estimated sum of $50 million in order to complete the project from start to finish. In the regard, Cobalt has flagrantly violated its own non-circumvention provision of the mutual non-disclosure agreement, which it drafted, not to circumvent NYBAY by replacing NYBAY in or about July 2018 with another investment bank with offices in Mexico, Evercore, Inc. ("Evercore") without NYBAY's prior knowledge and consent.

5.   NYBAY has had long-standing, business relationships with Evercore in Latin America, including Mexico, regarding raising or facilitating finance or capital raises with third party lenders, investors and partners for clients such as Cobalt.

6.   Defendant's flagrant, multiple breaches of contract have gone so far as to fail to honor its obligations to move forward in good faith to mediate the claims in this action under JAMS ADR Case no. 1425027340 before either of two highly credentialed and respected retired judges from the Southern District of New York proposed for the mediation.

## II. PARTIES

7.    NYBAY is a limited liability company organized and existing under the laws of State of Delaware, having a principal place for doing business at 48 Wall Street, New York, New York. NYBAY provides financial advisory and other services to national and international clients with a particular emphasis in Mexico. NYBAY is a party to the contract at issue in this action.

8.   Cobalt Holdings, Inc is a business corporation organized and existing under the laws of State of Delaware, having a principal place for doing business in Lake Bluff, Illinois. Cobalt through its wholly-owned Mexican operating subsidiaries, Cobalt Broadband Services S.A. de C.V. and Sanalto Redes Peninsular, S.A.P.I. de C.V., is a licensed telecommunications provider in Mexico. Cobalt is a party to the contract at issue in this action.

## III. JURISDICTION AND VENUE

9. This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C.§1332(a). This is a civil action where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between the plaintiff and defendant.

10.   Further, under Section 7 of the contract at issue, the parties agreed to the exclusive jurisdiction of, and venue in the Southern District of New York.

## IV.  FACTUAL ALLEGATIONS

**$82.5 million in Finance or other Investment**
**for Telecommunications Development Project in Mexico.**

11.   Cobalt is a privately held wireless broadband, cross-border development company.

12.   As part of its strategic plan for growth in the emerging markets in the Mexican Caribbean, Cobalt required an estimated total of $82.5 million in project finance in the form of a credit facility or other investment from start to finish toward the expansion of broadband infrastructure. Cobalt, through its GigNet network, is a major provider of managed services, with a focus on the tourism sector, with more than 23 million visitors projected year-end 2018.

13.   The essential purpose of the initial $32.5 million credit facility as part of the greater $82.5 million in total planned funding, is to enable the complete development and build-out of a fiber-optic broadband network, stretching 180 kilometers between Tulum and Cancun, known as the Riviera Maya. This will enhance the company's internet and wi-fi service offerings to resorts, hotels, enterprises and other carriers in the region. The plans for the first round of $32.5 million in project finance in the form of a substantial credit facility, also included the completion of a 5,000-square-foot facility in Cancun's business district. The facility will also function as Cobalt's network operations center, primarily for sales and marketing (hereinafter, collectively the "Project").

**Engaging Investment Banker with Cross-Border,**
**Emerging Markets Expertise in Latin America for the Project**

14.   In deciding which financial advisor was best suited to render financial and merger and acquisition advisory services and assist Cobalt with formulating the business plans, valuations, structuring, negotiation and implementation of the debt financing required for the

Project, and identify potential lenders, investors or partners to finance the Project, as well as assist in the preparation and presentation of analyses required by them, or potential lenders, investors or partners identified or introduced by Cobalt, to evaluate these opportunities, Cobalt in or about July 2017 turned to Hon. Jaime Deschamps, the former chair of the Federal Commission of Telecommunications in Mexico (Comision Federal de Telecomunicaciones), known as CoFeTel, the regulator of telecommunications in Mexico. [1]

15.  Mr. Deschamps' recommendation was NYBAY because of their cross-border, Latin America niche in the Investment Banking industry in New York with affiliated and associated offices throughout Latin America, with particular expertise in Mexico. This includes a partner level Certified Public Accountant from Mexico as well as two additional partners with Mexican citizenship.

16. Based on this recommendation among others, the Chief Executive Officer for Cobalt, Paul Moore then contacted the managing partner for NYBAY, Julio A. Marquez.

17.  Moore explained that Cobalt develops fiber optics businesses in the emerging markets (nothing in the United States), and was looking for financial as well as merger and acquisition advice because Cobalt was considering buying a division, or assets, of a Mexican company, Axtel (the "Axtel Telecommunications Asset Purchase").

18.  In order for NYBAY to evaluate preliminary confidential documents of Cobalt as well as to review NYBAY's preliminary, proprietary evaluations and analyses with the respect to the Axtel Telecommunications Asset Purchase, and the greater development and build-out for the Project in Mexico pending a decision by both parties to enter into an advisory contract with

---

[1] CoFetel is roughly equivalent to the Federal Communications Commission in the United States. CoFeTel was replaced by Federal Telecommunications Institute known as IFT in 2013. Among Mr. Deschamps credentials are his professional qualifications as an attorney duly licensed to practice in Mexico as a member of the Mexican federal bar.

NYBAY for the Project, Cobalt asked NYBAY to enter into their standard Mutual Non-Disclosure Agreement (the "Mutual NDA"). It was signed and became effective as of July 15, 2017, a full and complete copy of which appears attached as Exhibit A.

19.  The Mutual NDA contains an explicit and broad non-circumvention provision which provides at Section 5:

> The Parties and their Representative shall not circumvent **any** relationships of the Party that were established, or that currently exist, **prior to the date** hereof. This obligation not to circumvent precludes a Party and their Representatives from contacting, either directly or indirectly, any person or entity introduced to the Party or their Representatives by the other Party to negotiate or to conduct any business, **without the introducing Party's knowledge and consent, unless the other Party or their Representatives have had an ongoing relationship with such person or entity that can be documented in writing to the introducing Party** (emphasis furnished).

20.  After two introductory meetings to potential project finance sources for the Project by NYBAY to Cobalt, the Parties accepted and agreed to the final terms and conditions of a contract, dated August 10, 2017, a full and complete copy of which appears attached as Exhibit B (the "Investment Banking Contract" or "Contract").

21.  The Investment Banking Contract at Section 5 incorporates by reference the Mutual NDA and reaffirms each of the agreement's terms and conditions.

22.  The Contract is signed, agreed to and accepted by Edward Mooney, in his capacities as Secretary, Director and Executive Vice President for Cobalt.

23.  The pertinent terms and conditions of the Contract are summarized as follows.

24.  First, the broad scope of the financial advisory and merger and acquisition services to be rendered by NYBAY Capital is underscored and prominently set forth in the introductory paragraphs and at Section 1, entitled, Services to be Rendered, on p. 1 of the Contract. It provides in pertinent part:

(NYBAY confirms their interest)… in collaborating with….(Cobalt) to help make your plan for the establishment of a new fiber-optic network in the Riviera Maya (the "Project") a reality.

Section 1. Services to be Rendered. In connection with this engagement, NYBAY will provide advice and assist the Client with the business plan, valuation, structuring, negotiation and implementation of the Transaction (initial debt or equity transactions for the Project estimated at the time of signing in the sum of no less than $25 million). In particular, we will use our best efforts to identify and introduce to you potential investors, partners and/or lenders to complete the proposed Transaction, as well as assist you in the preparation and presentation of analyses required by such third parties, or other parties identified by you, to properly evaluate these opportunities.

…NYBAY is neither a law firm nor an accounting/tax firm nor a broker-dealer. Should the Client require the services of a law firm or accounting/tax firm, we may recommend several. Should the Client require a U.S. broker-dealer, NYBAY will refer the Client to Young America Capital LLC.

25.   Second, under Section 2, entitled Fees, under unnumbered bullet one, Cobalt agrees to pay NYBAY a non-refundable Retainer of $15,000.00 for credit against future success fees.

26.   Regarding Debt Transactions such as the credit facility for the Project, Cobalt agreed to pay under unnumbered bullet 3 of Section 3, 3% of the amount loaned to the Client, or for the Project by a lender, which lender was either (i) introduced to the Client by NYBAY or (ii) participated in the Transaction wholly or partly as a result of NYBAY's efforts, payable…on the closing day and as a condition to closing…

27.   While the focus of the engagement of NYBAY by Cobalt at the outset was acquisition and project finance advice and related services, NYBAY also has expertise in rendering financial advisory services for equity investment or capital raising for which NYBAY's agreed upon fee is 6% under unnumbered bullet 2 of Section 2, similar to the above terms and conditions for Debt transactions.

28.   With regard to what is commonly known in the Investment Banking industry in New York as a "Tail" Cobalt agreed that "[i]n the event that a portion of the investment amount or loan is paid at a date after the initial closing…the fees will be paid…when the Client or any Project-related person or entity receives additional proceeds."

29.   With respect to Term, Termination and Notice under Sections 3, 4 and 8, the Contract provides the following.

30.   The Term of the Engagement under Section 3 is through December 31, 2017 which "may be automatically renewed in subsequent three-month extensions at the option of the Cobalt and with NYBAY's consent "unless written notice of termination is given by either party at least fifteen days prior to the Termination Date," defined as December 31, 2017 under Section 3.

31.   No Termination of the Contract occurred under Section 3 before December 31, 2017.

32.   The term of the Contract during which NYBAY Capital acted as Cobalt's exclusive investment banker, was thereafter automatically renewed under Section 3 for at least three successive three-month terms through the third quarter of 2018, to September 30, 2018 by the continuing course of conduct of the Parties under the Contract through the date of the successful closing on the first round of project finance on May 31, 2018 (the "Closing"), and thereafter through late June 2018.

33.   Independent of the automatic three-month renewal provisions, the term of the Contract was additionally extended with respect to the rights, obligations and liabilities of the Parties that arise out of, or are in connection with them: A) during the period of the Tail of no less than an additional one-year through September 30, 2019 under Section 1, unnumbered bullet 5 and paragraph (c) of Section 4, entitled Termination; and B) during the period of no less than

8

two years "from the date hereof" through July 15, 2019 under Section 10 of the Non-Circumvention Provision of the Mutual NDA (Section 5 of the Contract).

34.  By email, dated June 27, 2018, Moore stated that he was terminating the Investment Banking Contract. This notice was insufficient under the requirements of Section 8 of the Contract ("Email Notice of Termination"),

35.  The Email Notice of Termination came only after NYBAY had already rendered comprehensive and extensive services in accordance with the Contract's scope of services under Section 1 for nearly a year's time through the date of the successful Closing in Mexico on the first round of debt financing on May 31, 2018.

36.  The Email Notice of Termination by Moore was sent before the end of the third automatic renewal period under the Contract for the third quarter of 2018 ending September 30, 2018.

37.  With respect to mediation as a pre-condition to this lawsuit, Section 7 of the Contract provides in pertinent part:

> Each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York **any action**, suit or proceeding **arising out of or relating to this Engagement or any of the transactions contemplated hereby**, and agrees that any such action, suit or proceeding shall be brought only in such court…**Prior to filing a lawsuit, the parties hereby agree that they will attempt to resolve their differences first by submitting the matter for resolution to a mediator, acceptable to all parties, and whose expenses will be borne equally by all parties**. The mediation will be held in the County of New York, State of New York, **on an expedited basis**. If the parties cannot successfully resolve their differences through mediation, the matter will be resolved by litigation (emphasis furnished).

38.  Regarding the duties and obligations of Cobalt to cooperate, the Contract provides in pertinent part under Section 6:

The Client shall furnish NYBAY with all information, data or documents that NYBAY shall reasonably deem appropriate in connection with its activities hereunder and shall provide NYBAY full access to the Client's officers, employees and professional advisors to the extent reasonably necessary.

39.   With respect to Indemnification terms, the Contract under Section 10 broadly provides that Cobalt shall pay for "any and all" attorney's fees and expenses of NYBAY "whatsoever" in prosecuting this action, "including, but not limited to fees and expenses in…investigating…(or) preparing or defending against any litigation commenced or threatened."

40.   Further, NYBAY's right to recover attorney's fees and expenses under Section 10 is "based upon or arising out of… any breach by the Client, or breach by the Client of any covenant …contained herein or in any other document…(including the Non-Circumvention Agreement) in connection with.. (the Contract)".. or any Transaction under it.

41.   With respect to Assignment, the parties agree under Section 9 that there would be no assignment of the rights, obligations and liabilities under the Contract of either party without the written consent of the other party.


## V. CLAIMS FOR RELIEF


### Claim One
### (Breach and Anticipatory Repudiation of Contract)

42.   NYBAY incorporates by reference the allegations contained in paragraphs 1 through 41 of this Complaint as if fully set forth at length.


**A.  Cobalt's Breaches and Anticipatory Repudiation of its Duties and Obligations Under Contract and Non-Circumvention Agreement**

43.   The Contract is binding and enforceable.

10

44.  At all times relevant to this action, NYBAY stood ready willing and able to perform each of their duties and obligations, and did render comprehensive, detailed and extensive financial and merger and acquisition advisory and related services under the Contract for project finance and other investment regarding the development and build-out for the entire, projected $82.5 million Project.

45.  In keeping with the scope of financial advisory, merger and acquisition and related services under Section 1 of the Contract, NYBAY prepared and presented on behalf of Cobalt to potential third-party lenders, investors and partners, comprehensive, detailed and extensive confidential work product for the Mexican Project spanning nearly a year's time (the "Work Product") until Cobalt's Email Notice of Termination of the Contract in late June 2018.

46.  The Work Product includes 1) business plans; 2) business models; 3) multiple series of spreadsheets and financial evaluations and analyses; 4) marketing and related presentation materials; and 5) Spanish translations for the use of complex and technical documents for the Project.

47.  Defendant breached and anticipatorily repudiated the plain terms and conditions of the Investment Banking Contract in the following material respects.

48.  First, NYBAY rendered an invoice in the sum of $450,000.00 ($465,000.00 less $15,000 paid retainer) for Investment Banking services rendered for the closing on the first round of the credit facility for the Project in the sum of $15.5 million due and payable upon Closing on May 31, 2018, no part of which has been paid.

49.  In addition, under the same closing for the first round of project finance, Cobalt has or will have drawn down an additional $4.5 million, and an additional $12.5 million for leases

and hotel lateral build-outs for a total of $32.5 million for first round project financing by or about year-end 2018.

50.  Total fees due and owing for NYBAY for the Cobalt's first round of debt financing is $960,000.00 for Cobalt's breaches and anticipatory repudiation of the Investment Banking Contract. NYBAY's transaction-based compensation for the first round of project finance is 3% under the Contract (Section 2, unnumbered bullet 3), and is arrived at as follows. (3%) ($32.5 million) less $15,000.00 retainer paid by Cobalt, equals $960,000.00. No part of these fees have been paid.

51.  Moreover, Cobalt has anticipatorily repudiated its obligations to pay transaction-based compensation or success fees to NYBAY for the second round of financing or other investment in the estimated sum of $50 million to complete the entire Project. The second round will enable Cobalt to realize projected returns, and to begin paying down the first round of $32.5 million in project finance for the Project.

52.  There are two prongs to Cobalt's anticipatory repudiation of the Investment Banking Contract.

53.  First, by defaulting in its obligation to pay NYBAY's invoice in the sum of $450,000 since the date of Closing on May 31, 2018, and by setting forth a series of transparent pretexts not to make any payments to NYBAY under the Investment Banking Contract as set forth in greater detail below, Cobalt has made its intention plain not to honor its obligations to make payment for the balance due under the Contract regarding the entire first round of financing in the sum of $32.5 million, including its binding and enforceable Tail.

54.  Second, Cobalt has flagrantly violated Section 5 of Mutual NDA, attached as Exhibit A, not to circumvent NYBAY by replacing NYBAY in or about July 2018 with another

investment bank with offices in Mexico, Evercore, Inc. ("Evercore") without NYBAY's prior knowledge and consent (the "Cobalt Circumvention").

55.   NYBAY has had long-standing, business relationships with Evercore in Latin America, including Mexico, regarding raising or facilitating finance or capital raises with third party lenders, investors and partners for clients such as Cobalt.

56.   Cobalt and their representatives have been unable or unwilling to begin to document in writing that they previously engaged, or at any previous time incurred time and expense as a client of Evercore in accordance with the plain terms of Section 5 of its own Mutual NDA, attached as Exhibit A.

57.   NYBAY discussed with Evercore potentially facilitating raising a second round of project finance or investment from third party lenders, investors or partners to complete the Project, and introduced Evercore to Cobalt during the term of NYBAY's Investment Banking Contract.

58.   As a result of the Cobalt Circumvention, NYBAY has been damaged by Cobalt regarding transaction-based or success fees otherwise due and payable for investment banking fees regarding projected $50 million in second round financing at 3% for debt transactions; and 6% for equity investment.

59.   NYBAY's damages for the second round of financing are therefore $1.5 million for debt transactions, or $3 million in transaction-based fees if the second round is equity investment under Section 2 of the Investment Banking Contract.

60.   In sum, NYBAY's damages under the first round of financing for breaches and anticipatory repudiation of the Investment Banking Contract are no less than $960,000, and an additional $1.5 million for the second round of financing, if debt transactions for a total of $2.46

million; or, in the alternative, an additional $3 million if equity investment, for a total of no less than $3.96 million.

**B. Pretexts Employed by Cobalt for not paying NYBAY any Success Fees or Transaction-based Compensation for Financial Advisory, Merger and Acquisition and Related Services Rendered Under the Investment Banking Contract**

61.   The pretexts employed by Cobalt for its complete failure to pay any amount due NYBAY under the explicit terms and conditions of the Investment Banking Contract do not hold up under even the most cursory of scrutiny.

62.   The bad faith nature of each of the Cobalt pretexts is underscored by their timing. They each were conveniently manufactured for the first time in June 2018, only after the successful closing on the first round of project financing already occurred on May 31, 2018. The pretexts generally fall into the following three categories.

63.   Cobalt pretext number one is particularly farfetched. Cobalt maintains that it is not paying any portion of the fees due NYBAY Capital, because it is not a registered United States Broker Dealer.

64.   However, Cobalt's own press releases point out that the development and build-out of the telecommunications project on the Riviera Maya is a purely foreign transaction in Mexico by a Mexican lender doing business in Mexico for the Mexican Project subject to the telecommunications and other regulatory authority of the Mexican government.

65.   Furthermore, the initial transaction involved was for project finance, or pure debt in the form of a revolving credit facility line from an international lender, the Mexican offices of Credit Suisse Group AG for up to $32.5 million to fund the initial development and build-out for the Project. There is therefore no basis to say that the sale of United States securities is involved that would have required the services of a registered broker-dealer in the United States.

66.   Moreover, Cobalt explicitly "accepted" and "agreed" under Section 1 of the Investment Banking Contract, that the services being rendered by NYBAY for which their fees would be earned was not that of a United States broker-dealer, and that if the services of one was required NYBAY would refer Cobalt to Young America Capital, LLC ("YAC").[2]

67.   The Parties agreed that no United States broker-dealer representation was required and therefore no such referral was made through and including the successful date of closing on the first round of project finance on May 31, 2018, and thereafter through late June 2018.

68.   Cobalt pretext number two for its complete failure to pay any amount due NYBAY under the explicit terms and conditions of the Investment Banking Contract, is that NYBAY "did not perform."

69.   However, the comprehensive, extensive and detailed Work Product generated, presented and negotiated on behalf of Cobalt by NYBAY with potential third party lenders, investors, or partners identified and introduced to Cobalt by NYBAY, or other third parties identified and introduced by Cobalt to NYBAY under Section 1 of the Contract, spanning nearly a year's time through the date of the successful Closing for the first round of project finance on May 31, 2018, shows that this Cobalt pretext does not hold up to the most cursory of scrutiny as well.

70.   Cobalt pretext number three for its complete failure to pay any amount due NYBAY under the plain terms and conditions of the Investment Banking Contract is that Cobalt had to

---

[2] In keeping with Cobalt's agreement and acceptance regarding referrals to YAC as may be required under these circumstances, NYBAY's copyrighted website provides in pertinent part: "All securities transactions in the United States are completed through Young America Capital, a member of FINRA and SIPC." This information has been clearly and continuously set forth on the NYBAY website since the Contract was entered into on August 10, 2017.

pay closing fees to the lender for the initial round of project finance at the Closing, and that NYBAY did not introduce this lender to Cobalt.

71.   The third Cobalt pretext perhaps makes the least sense of all. The fees that a multinational bank or other lenders charge to close for a substantial $32.5 million credit facility, involving project finance or otherwise, are on their face separate charges. Payment for fees due and payable NYBAY are under an entirely separate Contract for distinctly different financial advisory, merger and acquisition and related services.

72.   NYBAY's services in this regard were on a "best efforts" basis, and not made conditional or contingent upon a multinational bank or other lender not charging closing fees under its separate contract with Cobalt for furnishing the first round of debt financing for the Project in accordance with Section 1 of the Investment Banking Contract.

73.   Moreover, NYBAY's fees are not conditional on introducing any particular lender, investor or partner. Sections 1 and 2 of the Investment Banking Contract are plain in providing that NYBAY's transaction-based compensation or success fees are fully earned, independent of whether or not such third parties were identified and introduced by NYBAY or identified and introduced by Cobalt.

74.   In short, NYBAY's fees are not limited to financing or other investment it exclusively procures under the plain terms of Section 1 of the Contract.

75.   Notwithstanding the foregoing, NYBAY was indeed instrumental in collaborating with Cobalt, at the request of Cobalt, in helping to identify, introduce and actively facilitate the procurement of one of the leading multinational financial services company, Credit Suisse AG for the Closing.

76.   Credit Suisse AG has their headquarters in Zurich and offices in every major financial center worldwide, including New York.

77. The arm of Credit Suisse AG that closed on the $32.5 million credit facility in Mexico for the initial round of project financing for the Closing was Credit Suisse Asset Management. This is a business within Credit Suisse AG's International Wealth Management division. In Mexico, the group manages several country-dedicated funds that incorporate debt strategies with private companies, such as the first round of project finance, credit facility of $32.5 million that successfully closed with Cobalt.

78.   NYBAY was actively involved as the representative of Cobalt in several meetings, presentations of NYBAY Work Product, and negotiations for more favorable terms with potential third-party lenders, including Credit Suisse AG Mexico, for over seven months from October 2017 through April 2018. This extensive process culminated in the Closing for the $32.5 million first round of financing on May 31, 2018.

79.   The successful Closing laid the important groundwork to continue negotiations for favorable financing or other terms regarding any further lending or investment required to complete the second round of a projected additional $50 million planned finance or other investment for the total $82.5 million Project from beginning to end.

**C.  Cobalt's Repudiation of its Contractual Obligation to Mediate
in Good Faith under JAMS Case no. 1425027340 before proceeding
to litigation in the Southern District of New York**

80.   In light of the foregoing breaches and anticipatory repudiation of Contract by Cobalt of its duties and payment obligations under the Investment Banking Contract, NYBAY completed a Case Submission to the JAMS ADR Resolution Center in New York, New York, dated August 15, 2018, as required pursuant to Section 7 of the Investment Banking Contract

(the "JAMS Mediation Filing") before filing this Complaint in the Southern District of New York.

81.   The JAMS Mediation Filing, on notice to the attorneys for Cobalt for the Project, included completed detailed sections for the nature of the dispute between the Parties; claims and relief sought by NYBAY as Claimant; and a brief description of the case, including issues in controversy and case history.

82.   The JAMS Mediation Filing included the selection of two prominent, retired judges from the Southern District of New York. Both judges are highly experienced in resolving complex cross-border, international disputes, such as the one in this action, involving the development and build-out of one of the largest, telecommunications projects in Mexico on the Riviera Maya.

83.   In addition, one of the judges is a Distinguished Fellow of the International Academy of Mediators, a member of the International Mediation Institute, and is fluent in Spanish and can effectively communicate with Spanish-speaking litigants and clients. Cobalt filed no objection with JAMS to either judge proceeding with the JAMS mediation.

84.   Dates were offered by the JAMS case administrator for the mediation to proceed for resolution of NYBAY's claims in this action before year end 2018.

85.   However, Cobalt cynically repudiated its contractual obligation in this regard by responding that it is not going to expend any "money on this matter." However, this in and of itself is a further breach by Cobalt, since Section 7 of the Investment Banking Contract plainly provides for the expenses of the mediation to "be borne equally" by the Parties.

86.   To underscore Cobalt's bad faith regarding the foregoing series of flagrant breaches of its payment and other obligations to NYBAY under the Investment Banking Contract, Cobalt

has also defaulted in paying approximately $300,000.00 for legal services for the Project

rendered by Mexican Counsel, Hon. Jaime Deschamps as well.

## Claim Two
## (*Quantum Meruit*)

87.  NYBAY incorporates by reference the allegations contained in paragraphs 1 through

86 of this Complaint as if fully set forth at length.

88.  In reliance on the defendant's promises and representations, NYBAY performed

valuable services for defendant with a reasonable expectation of payment.

89.  The defendant knowingly allowed NYBAY to perform its services without objection

and knowingly benefited from and enjoyed these services.

90.   NYBAY has not been compensated for the fair market value of the services

provided. As a result, NYBAY has been damaged in an amount to be determined at trial.

## Claim Three
## (Unjust Enrichment)

91.   NYBAY incorporates by reference the allegations contained in paragraphs 1

through 90 of this Complaint as if fully set forth at length.

92.   NYBAY provided defendant with valuable services.

93.   Defendant knew of the benefits it was receiving and accepted and enjoyed the

benefits of NYBAY's services.

94.   The defendant has been unjustly enriched by the refusal and failure to pay

NYBAY for the full value of NYBAY's services. As a result, NYBAY has been damaged in an

amount to be determined at trial.

**Claim Four**
**(Indemnification)**

95.  NYBAY incorporates by reference the allegations contained in paragraphs 1 through 94 of the Complaint as if fully set forth at length.

96.  The defendant authorized and agreed to indemnify and hold harmless NYBAY from any and all expenses incurred by NYBAY in connection with investigation and preparing any action or claim under the Investment Banking Contract, including prosecuting this action and the recovery of NYBAY's attorney's fees and expenses in doing so.

[The Balance of This Page Is Intentionally Left Blank]

WHEREFORE, Plaintiff requests judgment be entered against defendant for the following relief:

A. Directing the Parties to complete the mediation process in good faith on an expedited basis under pending JAMS mediation, Case no. 1425027340.

B. In the alternative, in the event that the JAMS mediation does not resolve the Plaintiff's claims, awarding Plaintiff:

1. Compensatory damages against defendant in an amount to be determined at trial, but in the sum of no less than $3.96 million dollars;

2. Pre-judgment interest on all amounts due; and

3. Attorney's fees and expenses.

C. Together with such other, further and different relief as is just and proper.

Dated: New York, New York
      April 23, 2019

DUANE MORRIS LLP

By: s/Evan Michailidis
   Evan Michailidis
   1540 Broadway
   New York, NY 10036-4086
   Tel. (212) 471-1864
   EMichailidis@duanemorris.com

CECCARELLI LAW FIRM PLLC

By: s/Joseph J. Ceccarelli
   Joseph J. Ceccarelli
   48 Wall Street, 11th Floor
   New York, New York 10005-2903
   Tel. (212) 889-3675
   jceccarelli@ceccarellilaw.com

*Attorneys for Plaintiff*
*New York Bay Capital LLC*